**CARL BOLANDER & SONS CO., et al., Appellants,**

v.

**CITY OF MINNEAPOLIS, et al., C.S. McCrossan Construction, Inc., Palda & Sons, Inc., Shafer Contracting Co., Inc., Shaw–Lundquist Associates, Inc., Respondents.**

No. C4–88–2383.

Court of Appeals of Minnesota.

April 25, 1989.

Review Granted June 21, 1989.

Patrick J. O'Connor, Jr., Thomas J. Vollbrecht, Hart, Bruner & O'Brien, P.A., Minneapolis, for Carl Bolander & Sons Co., et al., appellants.

Gerald Fitzgerald, Minneapolis City Atty., Minneapolis, for City of Minneapolis, et al., respondents.

Robert L. Meller, Jr., Best & Flanagan, Minneapolis, For Minneapolis Park and Recreation Bd.

Thomas Rooney, Rooney & Nielsen, Ltd., Arden Hills, for C.S. McCrossan Const., Inc., respondent.

Palda & Sons, Inc., St. Paul, respondent, pro se.

Carl A. Swenson, Doherty, Rumble & Butler, St. Paul, for Shafer Contracting Co., Inc., respondent.

Shaw–Lundquist Associates, Inc., St. Paul, respondent, pro se.

Heard, considered and decided by HUSPENI, P.J., and CRIPPEN and IRVINE *, JJ.

## OPINION

L.J. IRVINE, Judge.

Respondent City of Minneapolis awarded a construction contract for an improvements project to C.S. McCrossan Construction, Inc., a respondent in this case. Appellant Carl Bolander & Sons Co., the second lowest bidder on the project, sought injunctive relief to prevent the performance of the contract, or, in the alternative, a declaratory judgment to invalidate the contract because the bid was nonresponsive by failing to name a women-owned business enterprise. The trial court denied the injunction and determined the contract was valid and enforceable. We reverse and remand.

## FACTS

On August 26, 1988, respondents City of Minneapolis and the Minneapolis Park and Recreation Board, invited bids on a contract for construction improvements on the West River Parkway. The specifications and proposal for this project included reasonable opportunities for women and minority business enterprises (W/MBE). All bidders were required to meet a goal of subcontracting 10% of the total bid price to minority-owned businesses and 5% of the total bid price to women-owned businesses.

On September 15, 1988, the Board opened the bids on the West River Project, and C.S. McCrossan Construction, Inc., one of the respondents, was declared the apparent low bidder at $2,141,622.80. The apparent second low bidder was Carl Bolander & Sons Co., the main appellant in this case, with a bid of $2,168,347.50. The next three

bidders were Shafer Contracting Co., Inc. at $2,247,469.55, Palda & Sons, Inc. at $2,437,327.74, and Shaw–Lundquist Associates, Inc. at $2,458,517.90.

In its "SWORN STATEMENT REGARDING EQUAL OPPORTUNITY IN CONTRACTING" form, McCrossan listed only MBE, Inc. as a business with which it would utilize and document its best efforts in order to enter into subcontracts.

Appellants looked into McCrossan's bid on September 19, 1988 and noticed that no women-owned business enterprise was listed. Appellants submitted a written protest to the Park Board and a few days later appellant was informed that the Park Board had awarded the contract to McCrossan.

On September 28, 1988, appellants Bolander and Alice R. Bolander filed a complaint and a motion for a temporary injunction or, in the alternative, for an order declaring the contract awarded to McCrossan null and void. On October 6, 1988, the trial court granted the motion for a temporary injunction and reserved a ruling on the validity of the contract. The court was concerned about the city's handling of Bolander's written objection.

The trial court held a hearing on October 11, 1988, and in an order for judgment dated October 13, 1988, it denied the motion for a temporary injunction and declared the contract valid and enforceable.

The court was not satisfied that McCrossan's bid was responsive. The court noted Mary Nagler, the Project Manager for the W/MBE Program of the City of Minneapolis, testified that the minority and women figures were goals each bidder was requested to achieve which were not etched in stone, and that deviation would be allowed. She had inquired about McCrossan's efforts to use a W/MBE firm and the company said it would subcontract part of the work, corresponding to 5% of its total bid, to a women-owned business. McCrossan agreed that L & D Trucking, a W/MBE firm, would be used to perform this work. The court found that McCrossan "is now

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

bound by its bid and its oral representation that it will require its minority business enterprise to subcontract 5% to a W/MBE as part of its contract with MBE." The court determined there was no prejudice to other bidders, and that this case does not reach the level of ambiguity and unfairness required in *Gale v. City of St. Paul*, 255 Minn. 108, 96 N.W.2d 377 (1959).

Appellants contend the contract is invalid because respondent's failure to list a women-owned business enterprise rendered the bid nonresponsive. Appellants alternatively claim the contract was ambiguous and the city's procedures were unfair and unreasonable. Because we agree that respondent's bid was nonresponsive, we do not address appellants' other claims.

## ISSUE

Did the trial court err in declaring the contract valid and enforceable?

## ANALYSIS

In light of the fact that the trial court's order for judgment came before any trial on the merits, we treat our review essentially as if it were from a summary judgment. This court must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979).

### 1. *Responsiveness*

The specifications and proposal for the West River Road Project included the following paragraph in the Notice of Calls for Bids:

> All bidders submitting proposals on this project are required to comply with the Section II "Local Requirements for Women and Minority Business and Equal Employment Opportunity for the City of Minneapolis" and submit this information with their bid documents by the specified bid opening time and date. Failure to submit this information with your bid shall render a bid/bidder nonresponsive and that bid will not be considered by the City.

The specifications deemed failure to comply with the W/MBE goals as grounds for nonresponsiveness:

> A bidder's or proposer's failure to meet the minority or female business utilization goals set for a project, or to show meaningful good faith to meet the goal, shall be grounds for finding the bid or proposal nonresponsive.

Section II of the proposal and specifications relates to women and minority business participation and sets forth the regulations, goals, contract goals, methods, submittal procedures, and the pre-award conference procedure. Section 2.03(B) of the specifications provided that:

> All firms shall submit a completed copy of the form entitled, 'SWORN STATEMENT REGARDING EQUAL OPPORTUNITY IN SUBCONTRACTING,' duly signed and notarized. Compliance with the requirements of this statement is only necessary, if and when, the need for purchases and/or subcontracts should occur. (see attachment C).

Attachment C included language of commitment recognizing that the city "assessed" a 5% and 10% W/MBE "goal be adopted and pursued by all contractors submitting bids," and it also included the following section for listing intended subcontracts with W/MBE businesses:

> B. Our firm will utilize and document its best efforts to enter into subcontracts with the following women/minority businesses in the event it is awarded the contract.

Space was available beneath this statement to list the W/MBE firm name, address, phone number, and dollar amount.

Appellants first contend that McCrossan's bid on its face was not responsive to the city's W/MBE participation requirements because it failed to list a women-owned business enterprise. The respondents contend it was within the Park Board's authority to determine whether McCrossan's bid was nonresponsive, that the Board did in fact determine the bid was responsive, and that if there was a varia-

tion from the city's specifications it was immaterial.

■ In *Griswold v. Ramsey County*, 242 Minn. 529, 65 N.W.2d 647 (1954), the Minnesota Supreme Court described the essential nature of the competitive bidding process:

A fundamental purpose of competitive bidding is to deprive or limit the discretion of contract making officials in the areas which are susceptible to such abuses as fraud, favoritism, improvidence, and extravagance. Any competitive bidding procedure which defeats this fundamental purpose, even though it be set forth in the initial proposal to all bidders, invalidates the construction contract although subsequent events establish, as in the instant case, that no actual fraud was present. It is for this reason that no material change may be made in any bid after the bids have been received and opened since to permit such change would be to open the door to fraud and collusion.

*Id.* at 536, 65 N.W.2d at 652 (footnote omitted). *See also Telephone Associates, Inc. v. St. Louis County Board*, 364 N.W.2d 378, 381 (Minn.1985) (citing *Griswold*, 242 Minn. at 536, 65 N.W.2d at 652). "On all matters involving the substance of a competitive bid, such as those which may affect the price, quality or quantity, or the manner of performance, or other things that go into the actual determination of the amount of the bid, there may be no material variation or deviation from the specifications." *Foley Brothers, Inc. v. Marshall*, 266 Minn. 259, 263, 123 N.W.2d 387, 390 (1963). The bid "must conform substantially to the advertised plans and specifications, and that where there is a substantial variance between the bid and the plans and specifications it is the plain duty of the public authority to reject the bid." *Coller v. City of Saint Paul*, 223 Minn. 376, 384, 26 N.W. 2d 835, 840 (1947). "The test of whether a variance is material is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *Id.* "After bids have been received and opened, no

material change may be made in any bid." *Id.* at 387, 26 N.W.2d at 841.

■ The city's plans and specifications clearly call for each bidder to list the women and minority business enterprises it intended to use to fulfill the W/MBE goals. When a bidder fails to list W/MBEs as intended subcontractors, it gains two advantages, (1) the ability to repent after discovering its bid was too low or otherwise too difficult to fulfill, and (2) the opportunity to further negotiate. *Rossetti Contracting Co., Inc. v. Brennan*, 508 F.2d 1039, 1045 (7th Cir.1974); *Northeast Construction Co. v. Romney*, 485 F.2d 752, 756–57 (D.C.Cir.1973); *Coller*, 223 Minn. at 387, 26 N.W.2d at 841. Bids must be considered at the time of opening, and it is evident from the record that the city and McCrossan entered subsequent arrangements to meet the W/MBE goals.

Although arguably not a matter affecting the factors determining the amount of the bid, the omission of listing a WBE is taken out of the minor defect category by the plans and specifications which deem the failure to comply with W/MBE participation requirements as grounds for nonresponsiveness. *See Rossetti*, 508 F.2d at 1044. "Whether or not other bidders would be prejudiced by subsequential insertion, the government's broad policy objective [of minority participation] may be prejudiced by the omission." *Id.* at 1045 (quoting *Romney*, 485 F.2d at 759). We find that McCrossan's failure to list the appropriate W/MBE businesses constitutes a material variation which rendered its bid nonresponsive.

### 2. *Attorney fees*

■ On appeal, appellants request costs and attorney fees knowing respondents' performance on the contract has already begun. The general rule is that an unsuccessful bidder is not entitled to damages. *Telephone Associates, Inc.*, 364 N.W.2d at 382 (citation omitted). However, an unsuccessful bidder "is entitled to recover the costs incurred in preparing the unsuccessful bid for the * * * contract and its expenses, including reasonable attorney fees,

from the time it first intervened at the county board to prevent the award of the contract * * *." *Id.* at 383. We remand to the trial court for the determination of the proper award.

Reversed and remanded.

CRIPPEN, Judge, dissenting.

Unquestionably, the minority hiring standards of the City of Minneapolis are laudatory, and the courts must guarantee that they are not circumvented by improper bidding practices. In this case, however, appellant is asking us to interject a bidding standard more strict than permitted by reason or precedent.

1.

Contents of a bid declared nonresponsive by the bid proposal require rejection of the bid, whether or not the bid is otherwise in substantial compliance with contract specifications. *Rossetti Contracting Company, Inc. v. Brennan*, 508 F.2d 1039, 1044–45 (7th Cir.1975) (where responsiveness expressly conditioned upon statement of minority participation for each trade to be employed, bid flawed by statement of participation goals below stated standards for several trades, including at least one trade to be utilized in performing the contract); *Northeast Construction Co. v. Romney*, 485 F.2d 752, 759 (D.C.Cir.1973) (where responsiveness conditioned upon statement of specific minority participation goals for trades to be used in performing the contract, bid flawed by stating only a general commitment to government's minority participation standards).

The pertinent bid proposal for the City of Minneapolis requires completion and submission of "Attachment C" as a condition of responsiveness. Attachment C calls for listing the "women/minority businesses" the contractor will attempt to use for subcontract work.

Minority participation standards of the City of Minneapolis are simple and absolute —no matter which trades are employed in subcontracting, 10 percent of the contract work is to be done by minority businesses and five percent by women business enterprises. There is no need or demand by the City, as in *Rossetti* and *Romney*, for declaring the trades which will be called upon to perform the contract and the special minority participation requirement for trades to be employed. In Attachment C, respondent clearly and unequivocally commits itself to the applicable city requirement for minority participation in subcontracting; respondent stated in the document that the dollar amount of its minority subcontracts would total no less than $321,243.42, exactly 15 percent of its total bid.

The city's bid proposal goes a step beyond those reviewed by the federal courts in *Rossetti* and *Romney*. The city asks for disclosure of the businesses the bidder will attempt to hire by subcontracts. Respondent did not ignore that requirement. Instead, respondent committed itself to arrange for subcontracting of 15 percent of the job through MBE, Inc., a minority business. Although MBE, Inc. is not a women's business, it is the evident implication of the bid that respondent expected further subcontracting through MBE, Inc. to achieve the commitment for five percent subcontracting to women business enterprises. There is no evidence suggesting respondent could not meet its commitment through MBE, Inc. As the trial court found, respondent is "bound by its bid" to contract with MBE, Inc. such as to guarantee that five percent of subcontracting will be to women business enterprises.

In my opinion, respondent adequately "completed" Attachment C. Neither the language in the attachment nor other language in the bid proposal makes it clear that responsiveness depends upon precise identification of every business that may be employed to meet minority participation standards. In fact, the disclosure is at best a nonbinding suggestion of prospective subcontractors. Moreover, unlike the circumstances in *Rossetti* and *Romney*, there is no evidence in the case that further disclosure would be of any significance in serving the purposes of the city to encourage minority participation.

2.

Independent of bid proposal language on responsiveness, there is little or no question here that respondent has submitted a lawful bid. To perform its contract, respondent must utilize qualified women/minority business enterprises. There is no evidence that specific designation of these businesses has any significance in terms of the price the city must pay, the quality or quantity of work to be done under the contract, the manner of performance, or any other factor that goes into determination of the amount of the bid. Additional disclosures on the identification of subcontractors is immaterial to the requirement of fair bidding. Consistently, the trial court observed that it "fail[ed] to see how any other bidder was, or could have been prejudiced by McCrossan's bid statement as submitted to the City."

Appellant emphasizes an observation in *Romney,* quoted in *Rossetti,* to the effect that a bidder must not be permitted the advantage of backing away from its commitment, or the opportunity to further negotiate its commitment. *Romney,* 485 F.2d at 756–57; *Rossetti,* 508 F.2d at 1045. Thus, as these federal courts indicate, the commitments of the bidder must be found in the bids, not in subsequent statements. Those observations of law govern bids which are limited or unclear, but they do not determine the present litigation. There is simply no evidence here that respondent can renounce or renegotiate its unequivocal commitment to meet the city standard on participation of women business enterprises.

The trial court's decision should be affirmed, and I respectfully dissent.